The Assistant Vice-Chancellor.
The motion to suppress the deposition of Charles Moore, presents a new question. He was properly included in the suit as a defendant, and in one aspect of the relief sought by the bill, a sale of the lot in question as being the real estate of Lewis Moore at his death, Charles Moore was a necessary party.
He has been examined as a witness in favor of his co-defendants, M. P. Moore and W. B. Aitken, adversely to his own interest in the subject matter of the suit.
There is no doubt that the general rule is as insisted on by the defendant’s counsel, that one defendant may examine as a witness in his own behalf, another defendant who is not interested in the question to which he is called.
*44 And I think, with his own assent, he may in general, be examined for his co-defendant against his own interest. Where he is interested, and is unwilling to testify, he cannot be improved as a witness in equity, or at law.
Is an infant within the general rule ? An infant’s admissions may be proved against him, but they are to be cautiously weighed with reference to his age and understanding.
Here the infant could not be compelled to testify. The officer appointed by the court to watch over his interests in the suit, objected to his being examined. If these defendants had sought to compel him to testify by a cross bill, the court would not have permitted him to answer on oath ; and if he had inadvertently admitted their allegations, they would not be entitled to any relief upon such admission.
The court is bound to see that an infant litigant’s rights and interests are protected. It will not suffer him to make a discovery in the suit, nor to affect his rights by any admission contained in his answer. When there is a discretion to be exercised for him, or affecting his interests, the court appoints a suitable person, or refers it to a master, to execute such discretion. In short, it protects him against his own immature judgment and improvident conduct, as well as against the acts and designs of others.
For these positions, I refer to a few of the numerous authorities, viz. Napier v. Effingham, (2 P. Will. 403;) Wrottesley v. Bendish, (3 ibid. 237 ;) Legand v. Sheffield, (2 Atk. 377;) Bulkley v. Van Wyck, (5 Paige, 536;) Stephenson v. Stephenson, (6 ibid, 353;) Bingham on Infancy, 114 to 121. In Serle v. St. Eloy, (2 P. Will. 386,) the Master of the Rolls refused to act on an admission made against her interest in a bill filed by an infant, and directed the cause to stand over, so that the bill might be amended. And see Lady Effingham v. Napier, (3 Bro. P. C. 301.) Lord T hurlow, it is true, allowed the infant’s guardian ad litem to be examined as a witness ; but the report does not show whether it was in favor of the infant or against him. (Walker v. Thomas, 2 Dick. 781.) In any event, he as guardian merely, had no interest in the event of the suit. The argument is plausible, that an infant ought to be permitted to tell the truth, even when it is against his own interest. And the *45 argument would be equally cogent, to allow a complainant to compel an infant who is eighteen or twenty years of age, to answer his bill on oath and be bound by his discovery. But so long as the court undertakes to protect the rights of infants ; shielding them from discovery, exercising all discretion for them, and precluding them from influencing their interests, either by their acts, or their ad missions in pleading; I think it would be subversive of the principles upon which the court thus proceeds, to suffer an adult defendant, by any inducements, whether of persuasion or of threats, to obtain an infant’s consent to appear and testify as a witness against his own interest, in a cause where he is a party.
I do not say that in every such case the adult defendant shall be inflexibly precluded from obtaining testimony from an infant co-defendant; but I am entirely satisfied that it should not be permitted except by the special order of the court, made upon a full understanding of all the circumstances.
The deposition of Charles Moore, must therefore be suppresssed.
The principal questions involved in the cause - are free from difficulty.
Mr. Aitken claims to be a bona fide purchaser of the house and lot, without notice, but his case presents scarcely a single element of such a purchase. One indispensable requisite to establish the character of a purchaser in good faith, is the payment of the purchase money. Now Mr. Aitken, when this bill was filed had not paid a cent of the sum which he had bid upon the sale. The alleged crediting of the amount in the private account of M. P. Moore, when Aitken knew the money did not belong to him, does not deserve notice. In Dr. Moore’s own version of the affair before the surrogate, he says his father directed the. sale to be made for cash ; yet no cash whatever was paid, up to the period of this litigation.
M. P. Moore now appears before the court as the owner of the house and lot in fee, stating, it is true, an undefined and indeterminate arrangement between Aitken and himself as to the future ownership; but Aitken, having no legal title, nor any *46 claim as a bona, fine purchaser in equity, may be placed entirely out of view, in disposing of the rights of the parties.
The .case is thus narrowed down to a very simple state of facts; the narration of which will suffice to satisfy any fair mind of what the law should decide; and the rules of law, will be found in this respect, to second the dictates of integrity and good sense.
Dr. Moore from early in 1839 to the death, of his father in June 1843, was the agent of the latter, having the entire charge of his real and personal property in this city. The bond and mortgage of Wilkes came to his hands as such agent; and previous to 1842, he had obtained possession of the mortgaged premises. In 1841, they yielded a rent of $250, a year, out of which were payable the repairs, taxes and insurance. The loan made on this mortgage by Lewis Moore in 1836, was $4000. The mortgagor had become hopelessly insolvent. In the winter of 1841, 1842, when real estate was exceedingly depressed in price; having, as one of the masters of the court stated, no market price; this mortgage was foreclosed by Dr. Moore as his father’s agent. He attended the sale, and suffered Mr. Aitken to become the purchaser for $1660. Mr. Aitken was his legal adviser at the time, and he had suggested to A., that the sale was to take place, and expected to meet him at the sale. The mortgage debt was then about $5000; the property, yielding an income of $250, annually, was estimated by some witnesses as low as $1500, to 1600, for cash, and by others at $2800. It was appraised at $2500, by the assessors in their assessment for the city taxes in 1842. In the fall of 1845, the same witnesses valued it at $2900, and $4000 respectively.
Dr. Moore paid the master’s fees about a year after the sale. Nothing else was ever paid to the master ; but on his executing the deed to Aitken, Dr. Moore gave to the master his receipt for the.net proceeds of the sale, as agent for his father. While these proceedings were going on, the latter, an aged, infirm man, was drawing to the close of his life. He had intrusted every thing to his agent; he had rarely visited New York for several years, and not at all for two years, before his death ; and he died just after the delivery of the master’s deed. A few days after his *47 death, Mr, Aitken executed to Dr. Moore, a deed of the house and lot, which was not recorded ; and the latter has received the rents, with the exception of a single quarter, from the time the mortgagor gave up the possession, to the closing of the testimony in the cause.
He states that he credited the purchase money to his father in account, and he produced an account showing it credited under a date six days subsequent to his father’s death. And he now claims that the master’s sale was valid, and that his father had no right or interest in the property; and as a necessary consequence, that it belongs to him.
In other words, the position is, that the general agent of a party, proceeding to collect a mortgage for his constituent, may buy the property at the sale on the mortgage for less than a third of the debt, pay the price by a paper credit to his constituent, and become its absolute owner.
Before giving my view of this monstrous proposition, it is proper to advert to the ground on which the proceeding is justified by the defendants. Dr. Moore insists that his father had an inveterate horror of owning real estate in this city, and instructed him peremptorily, not to bid over $1500 on the sale of the house and lot. The deposition of Charles Moore being out of the case, there is no proof in support of this direction, except that derived from Dr. Moore’s examination before the surrogate, which was introduced as an admission by the complainants. There is no positive allegation in the examinations, that Lewis Moore restricted him to a bid of $1500. In one paragraph, Dr. Moore says that Aitken knew that his father had authorized him to go no higher than $1500 ; and in the only other paragraph concerning it, he says he told the master that he was limited by his father not to bid over $1500. He also states that he paid Whitely $20 for the release of the equity of redemption, with the consent of his father. But this payment was consistent with his father’s sttpposing either that he was the purchaser, or that the property was yet to be sold.
The testimony falls entirely short of establishing that Lewis Moore limited his agent to bid only $1500.
If the testimony of Charles Moore were admitted, it would *48 not materially affect the case. In order to support his own purchase of the subject matter of his agency, after proof of actual payment of the price, it would be incumbent on Dr. Moore to prove that his father gave the instruction after he had informed him fully of all the facts, and of his own intention to buy the property at a price beyond the limit designated. It seems that Lewis Moore’s dislike of New York lots, did not prevent him from buying in four other houses and lots on the foreclosure of mortgages, about the period of this sale; hence, that element of the alleged instruction is not sustained. Now, can any one believe, that Lewis Moore, as a man of sense and intelligence, if he had been aware of the state of the market for the sale of lands in New York, that there were none but forced sales made, that this lot was in a rapidly increasing part of the city, was in his own possession irrecoverably, and producing a net income equal to the interest, at six per cent, on at least $3000; that the mortgagor was desperate, and the lot on which he had loaned $4000, was his only resource for payment; would have instructed his agent to let it go for $1500 ? Especially, if his agent had told him that, if he would not bid beyond that, the agent himself would buy it at a greater price, Would not Mr. Moore, under those circumstances, have instructed his agent to bid $4000, rather than $1500 ?
Another ground which was urged at the hearing, was, Lewis Moore’s ratification of what had been done by his agent. This was not set up in the answers ; and, moreover, as it rests upon the testimony of Charles Moore ; I need not comment upon its validity.
The law is so clearly settled, that a purchase, under the circumstances of this case, cannot be permitted to stand; as to render it superfluous for me to state the authorities in detail. I will refer to Van Epps v. Van Epps, 9 Paige, 237; Torrey v. The Bank of Orleans, 9 ibid. 649, affirmed unanimously, in the Court for the Correction of Errors, December, 1843(a); Cram v. Mitchell, 1 Sandf. Ch. R. 251; and the cases cited *49 in those decisions; also, Rothschild v. Bookman, 5 Bligh, N. S. 165, 189; Charter v. Trevelyan, 11 Cl. and Fin. 714, 732. It was insisted, that the rule sustained in these cases, does not apply to a public judicial sale, and the case of Sheldon v. Sheldon, 13 Johns. 220, was relied upon as establishing the exception. That decision was in a court of law, and what was said upon this point, was merely a dictum of the Chief Justice. Under the issues there, the question could not be presented.
If it were a decision, Galatian v. Cunningham, 8 Cowen, 361, 372, 379, in our court of last resort, overrules Sheldon v. Sheldon. See also the note to 13 Johns. 222; and Davoue v. Fanning, 2 J. C. R. 252.
Mr. Aitken’s argument illustrates one of the many obvious reasons, why an agent should not be permitted to purchase at a sale like this, unless with the consent of his principal. He said it was the practice of mortgagees to have third persons appear and bid at their sales, instead of bidding themselves, lest others coming to bid, might suppose that the mortgagee intended to buy in the property, and that their competing with him would be useless. How easy is it, at such a sale, for an agent of the mortgagee, who wishes to buy the property at a low price, to cause the circle of bidders to understand, that the mortgage is more than its value, and that the mortgagee bidding through his friend, will not let it go for much less than the mortgage 7 And how difficult would it be to prove his interference 7
I do not assert that an agent may, in no case, purchase at a sale made in behalf of his principal. The principal may assent before hand, with full knowledge of the facts ; he may acquiesce after the sale, in a purchase made by his agent; or he may, by lapse of time, be debarred from questioning its validity.
But I must say, that in my judgment, the purchase in this case ought not to be permitted to stand as against the heirs of Lewis Moore, in any court of equity.
The purchase must be held to have been made for the benefit of Lewis Moore, and the title to have become vested in M. P. Moore, for the benefit of his heirs at law.
*50 Dr. Moore must account to the heirs, for the rents which he has received since the death of Lewis Moore, and all just allowances will be made to him for his disbursements for taxes, assessments, insurance and necessary repairs. A similar account must be rendered by Mr. Aitken, of the rents which he collected.
The decree will also direct the premises to be sold by a master, and that both Dr. Moore and Mr, Aitken join in executing a conveyance to the purchaser.
The proceeds of the sale, together with such sums, if any, as may be found due from those defendants in respect of the rents, will be distributed between the widow and heirs of Lewis Moore, in the same manner as if the land were sold under a decree in partition. The master will retain, from Dr. Moore’s share of the proceeds, the sum found due from him, if he has not previously paid it to the master for distribution. The shares of the infants are to be brought into court and invested, as also the third part out of which the widow is to receive the income, unless she accepts the present value of her dower right. The decree must declare the rights of the respective parties in the property.
It may also- provide for Mr. Aitken’s receiving from Dr. Moore, the sum paid by him to the latter, on the 29th of March, 1844.
The complainants are entitled to recover their costs of suit, against those defendants, up to the entry of the decree, together with the costs of the accounting. The costs of the sale, and those of the guardian ad litem, will be paid out of the proceeds of the sale.
Neither partyis to have costs against the other, on the motions to suppress testimony.(a)

 Reported in 7 Hill, 260. And see Dobson v. Racey, 3 Sand. Ch. R. 60; Ward v. Smith, ibid. 592.

 Affirmed by the supreme court in equity, in the first district, March 31, 1849, before Jones, Edmonds, and Hurlbut, Justices.